IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 16, 2019

**ASHLEY M. COOK v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Bedford County**
**No. 16258    Forest Durard, Jr., Judge**

_____

**No. M2018-01149-CCA-R3-ECN**

_____

The petitioner, Ashley M. Cook, appeals the summary dismissal of her petition for writ of error coram nobis, which petition challenged her 2008 convictions of first degree murder and conspiracy to commit first degree murder. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Ashley M. Cook, Nashville, Tennessee, pro se.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Robert J. Carter, District Attorney General; and Mike Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

A Bedford County Circuit Court jury convicted the petitioner of first degree premeditated murder and conspiracy to commit first degree murder for her role in the death of the victim, William Ross. This court summarized the evidence supporting the petitioner's convictions in our consideration of the sufficiency of the evidence on direct appeal:

> [T]he record shows that during the weeks leading up to the murder on February 14, 2007, [the petitioner] participated in several conversations with Justin Young and Kimberly Ross about killing the victim. A plan was then developed during which [the petitioner] would take a cab to the Golden Gallon, walk from the store to the victim's residence, and use a ladder

to climb in Mr. Young's bedroom window. [The petitioner] would then be given a gun to shoot the victim while he was in bed asleep. Mr. Young testified that he was supposed to wipe down the gun and place it in the gun cabinet with a clip in it waiting for [the petitioner]. Mr. Young and Mrs. Ross were then to be tied up, and they would tell police that two black men broke into the residence looking for Jimmy Whitmire, a former resident. After the shooting, [the petitioner] was supposed to leave town in Mrs. Ross' Nissan Versa.

The plan went into action on the evening of February 13, 2007, and continued into the early morning hours of February 14, 2007. The plan was originally supposed to have occurred the previous night, but [the defendant] could not be there. After the victim left for work on the morning of February 13, Mr. Young loaded a .380 pistol with five rounds, wiped it down, and placed it back inside the gun cabinet with one door left slightly ajar. He and Mrs. Ross had several phone conversations with [the petitioner] throughout the day to make sure that she was still coming over and to let her know that everything was "ready to go" when she arrived. [The petitioner] indicated that she would be there around 12:00 to 12:30 a.m. Although not part of the plan, [the petitioner] called two black men, Rodney Tinnel and Floyd Vinson, and arranged for them to be at her residence at the time of the murder.

At 12:54 a.m., while Mr. Tinnel and Mr. Floyd were still at her trailer, [the petitioner] dressed in dark clothing and called for an MTS cab to pick her up and take her to the Golden Gallon. [The petitioner] then left the store without paying her cab fare and walked to the victim's residence. She climbed up the ladder to Mr. Young's window wearing purple latex gloves, and he helped pull her inside. Mr. Young then gave her some money and the keys to Mrs. Ross' Nissan Versa. They walked down the hall to the living room where Mrs. Ross was waiting. Mrs. Ross then took the .380 pistol out of the gun cabinet and showed [the petitioner] how to use it. Mrs. Ross chambered a round so that all [the petitioner] had to do was "point and shoot." [The petitioner] then tied Mr. Young's hands and feet with bailing twine, and she used

-2-

a phone cord to tie Mrs. Ross. Mr. Young positioned himself on the floor between the chair and the hallway, and Mrs. Ross laid on the couch with her cell phone on the arm of the couch. [The petitioner] walked over to the bedroom where the unarmed victim was sleeping, pushed the door open with her foot, and began shooting. The three fatal shots hit the victim's left forehead, right chest, and left flank above the kidney. [The petitioner] then left as planned in the Nissan. Mrs. Ross called 911 and when police arrived, she and Mr. Young told them that two black men broke into the residence looking for Jimmy Whitmire and shot the victim. The victim was still alive when police arrived, and at no time did [the petitioner], Mr. Young, or Mrs. Ross render aid to him.

After shooting the victim, [the petitioner] acted with calmness and in taking steps to conceal her crime. She tossed the purple gloves out of the car, and she abandoned the car in a church parking lot. [The petitioner] arrived home and hid the .380 pistol underneath her mattress. In her first interview with Agent Wesson, [the petitioner] denied any involvement in the murder. She eventually told him about the plan to kill the victim, and she confessed [to] the murder. Although [the petitioner] claims that the dominion and control exerted over her by Mrs. Ross negates the element of premeditation, the record does not support this claim. Mr. Young testified that although Mrs. Ross could be persuasive and provided both him and [the petitioner] with financial assistance, she did not exert any undue influence over them. [The petitioner] herself testified at one point that Mrs. Ross never "personally" asked [the petitioner] to kill the victim, and she never thought that Mrs. Ross was serious about killing the victim.

*State v. Ashley Mai Cook*, No. M2009-00136-CCA-R3-CD, slip op. at 20-22 (Tenn. Crim. App., Nashville, Feb. 24, 2011) (*Cook I*). This court affirmed the petitioner's convictions and accompanying sentence of life plus 20 years on direct appeal. *See id.*, slip op. at 1, 31. The petitioner later filed a timely but unsuccessful petition for post-conviction relief, and this court affirmed the denial of post-conviction relief. *See Ashley Mai Cook v. State*, No. M2012-01876-CCA-R3-PC (Tenn. Crim. App., Nashville, May 23, 2013) (*Cook II*).

In May 2018, the petitioner filed a petition for writ of error coram nobis in the Bedford County Circuit Court, alleging that newly discovered evidence in the form of a statement from her co-defendant, Kimberly Ross, inculpating Justin Young in the murder of the victim and documentary "information obtained from the Emergency Medical Technician - Basic: National Standard Curriculum" entitled her to a new trial. The petitioner claimed both that Mr. Young had killed the victim and that the victim died as a result of medical error.

The court stated that it was "unsatisfied with the veracity of the letter" purporting to be from Mrs. Ross, observing that although the document was "purportedly signed by Mrs. Ross, it is undated and contains no other indicia of reliability, such as being notarized[,] and the origins of the statement are unknown or how long it has been in existence." In a footnote, the court further observed, "The entire statement is preposterous anyway." The court also deemed any claim regarding the statement to be untimely given that the petitioner did not indicate when she had obtained the statement.

Regarding the emergency medical technician's manual, the coram nobis court found that the petitioner had failed to establish that this information was unavailable at the time of trial or that it could not have been obtained through the exercise of due diligence. The court also concluded that, even if, as the petitioner claimed, the victim's death was hastened by improper medical treatment, the petitioner would not be entitled to relief given that the victim's death was the natural and probable result of the petitioner's having shot him multiple times.

In this appeal, the petitioner contends that the coram nobis court erred by summarily dismissing her petition. The State asserts that this court should dismiss the appeal as untimely. The State avers, in the alternative, that the coram nobis court did not err.

Tennessee Rule of Appellate Procedure 3 requires the notice of appeal to be filed within 30 days of the entry of the order being appealed. Tenn R. App. P. 4(a). The order summarily dismissing the coram nobis petition bears a file stamp date of May 14, 2018, and the petitioner's notice of appeal was filed on June 20, 2018. "[I]n all criminal cases the 'notice of appeal' document is not jurisdictional and the timely filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a). Given that the court's order was delivered to the pro se petitioner via United States Mail, it is not clear when the petitioner actually received the court's order. Moreover, the petitioner's notice of appeal and certificate of service both indicate that the document was signed and mailed on June 8, 2018, which would have been within 30 days of the court's order. Even if the petitioner's notice of appeal was late, a delay of six days does not seem

-4-

particularly egregious under these circumstances. Consequently, we elect to waive the timely filing of the notice of appeal in this case.

In support of her claim to coram nobis relief, the petitioner directs this court's attention to what she deems newly discovered evidence in the form of a letter that, the petitioner asserts, is from her co-defendant and a manual describing the appropriate standard of care to be used when caring for patients with injuries like those inflicted on the victim.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999) (citation omitted). Coram nobis relief is provided for in criminal cases by statute:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

T.C.A. § 40-26-105(b) (2006); *see State v. Vasques*, 221 S.W.3d 514, 525-28 (Tenn. 2007) (describing standard of review as "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different" (citation omitted)). The grounds for seeking a petition for writ of error coram nobis are not limited to specific categories but may be based upon any "newly discovered evidence relating to matters which were litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time. T.C.A. § 40-36-105(b).

The statute of limitations for filing a petition for writ of error coram nobis is one year. *See* T.C.A. § 27-7-103; *Mixon*, 983 S.W.2d at 670. "To accommodate due process concerns, the one-year statute of limitations may be tolled if a petition for a writ of error coram nobis seeks relief based upon new evidence of actual innocence discovered after expiration of the limitations period." *Nunley v. State*, 552 S.W.3d 800,

828-29 (Tenn. 2018) (citations omitted). The petition must establish on its face either the timeliness of the petition or must "set forth with particularity facts demonstrating that the prisoner is entitled to equitable tolling of the statute of limitations." *Id.* at 829.

Although the decision to grant or deny coram nobis relief rests within the sound discretion of the trial court, *see Vasques*, 221 S.W.3d at 527-28, "[w]hether due process considerations require tolling of a statute of limitations is a mixed question of law and fact, which we review de novo with no presumption of correctness," *Harris v. State*, 301 S.W.3d 141, 145 (Tenn. 2010).

The petitioner acknowledged in her petition that she had filed outside the one-year statute of limitations but argued that she was entitled to due process tolling of the statute of limitations because her "sentences are clearly within the range of sentences for which the appellate courts have found the considerations of due process applicable to permit a petition for relief beyond the applicable statute of limitations." This statement misapprehends the availability of due process tolling. The length of a particular sentence has no bearing on the issue of due process tolling. Instead, the proper inquiry is whether the petitioner has been "provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." *Nunley*, 522 S.W.3d at 830 (citation omitted).

As the coram nobis court correctly observed, the document purporting to be the statement of co-defendant Kimberly Ross bears no date, and the petitioner does not indicate when she became aware of its existence. Because the petitioner has failed to plead specific facts to support a finding of due process tolling relative to this claim, the petition was subject to summary dismissal as time barred. Moreover, assuming for the sake of argument that the petitioner came into possession of this document within one year of filing her coram nobis petition, she still would not be entitled to coram nobis relief because no "reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different." *Vasques*, 221 S.W.3d at 525-28 (citation omitted). The handwritten document, purportedly prepared by Mrs. Ross, described a series of events that is so utterly at odds with all of the proof adduced at the petitioner's trial as to be, as the coram nobis court observed, preposterous. For example, the writer claimed that Mr. Young shot the victim and bound Mrs. Ross, but when the police arrived, Mr. Young's "hands and feet were tied with bailing twine." *Cook I*, slip op. at 2. Contrary to the convoluted tale provided in the document, Mrs. Ross told responding officers "that she and the victim were in bed when 'two black males entered the home, one of which had come in their bedroom and asked where is Jimmy and William,'" and "then shot the victim, tied her up, and left the residence." *Id.* "Mr. Young 'told pretty much the same story.'" *Id.*, slip op. at 4. The petitioner sent two text messages to Mrs. Ross's cellular telephone shortly after the shooting, first indicating

"that Mrs. Ross 'told' on her and that she was going to jail for murder" and the second indicating that the petitioner "would tell everything if Mrs. Ross did not help her." *Id.*, slip op. at 4-5. Later, both Mr. Young and Mrs. Ross separately implicated the petitioner in the shooting. Most importantly, perhaps, the petitioner admitted both to the police and at trial that she shot the victim. The murder weapon was discovered under her mattress. We agree with the coram nobis court that the unsworn statement is utterly lacking in veracity or any indicia of reliability. In consequence, it cannot avail the petitioner of coram nobis relief, regardless of the timing of its alleged discovery.

Similarly, the information contained within the medical manual cannot avail the petitioner of the relief she desires. Although the petitioner alleged that she only discovered this document in December 2017, less than one year before she filed her petition for writ of error coram nobis, she failed to show that she could not have discovered it earlier with the exercise of due diligence. *See Mixon*, 983 S.W.2d at 670. Moreover, no evidence established a cause of the victim's death other than the three gunshot wounds inflicted by the petitioner. Although the victim was still alive when emergency medical personnel arrived, he was bleeding copiously and leaking "gray brain matter" from a gunshot wound above his left eye. *Cook I*, slip op. at 3. Emergency medical workers were initially unable to intubate the victim, *see id.*, but nothing suggests that this initial failure caused or hastened the victim's death. In consequence, the petitioner cannot establish that a "reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different." *Vasques*, 221 S.W.3d at 525-28 (citation omitted).

Based upon the foregoing analysis, we affirm the judgment of the coram nobis court.

_____
JAMES CURWOOD WITT, JR., JUDGE